# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Edward A. Bobrick | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 5726 | **DATE** | 8/19/2003 |
| **CASE TITLE** | McGinnis-Overton vs. Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant's Motion for Summary Judgment [21-1] is DENIED, and the Plaintiff's Motion for Summary Judgment [19-1] or Remand is GRANTED to the extent that this case is remanded to the Commissioner for further proceedings consistent with this opinion. Enter Memorandum Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | number of notices | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required. | | | | | |
| ✓ | Notices mailed by judge's staff. | | | AUG 2 0 2003 | | |
| | Notified counsel by telephone. | | | date docketed | | |
| | Docketing to mail notices. | | | | | |
| ✓ | Mail AO 450 form. | | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | | |
| SRB | | courtroom deputy's initials | | date mailed notice | | |
| | | | | SB | | |
| | | | | mailing deputy initials | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HAZEL McGINNIS-OVERTON, )
)
    Plaintiff, )
)
vs. )  No. 02 C 5726
)  Edward A. Bobrick,
JO ANNE BARNHART, Commissioner )  Magistrate Judge
of Social Security, )
)
    Defendant. )

**DOCKETED**
AUG 2 0 2003

## MEMORANDUM ORDER

Plaintiff Hazel McGinnis-Overton brings this action pursuant to 42 U.S.C. § 405(g)

to review a final decision of the Commissioner of Social Security ("Commissioner")

denying her Disability Insurance Benefits ("DIB").

## I. BACKGROUND

Plaintiff filed an application for DIB on October 29, 1994, alleging she was

disabled since October 29, 1994, as a result of hypertension and various musculoskeletal

impairments. (Administrative Record ("R.") at 34-37). Her application was denied at the

initial levels of administrative review, and she requested an administrative hearing. (R.

38-50). On March 18, 1998, an administrative law judge ("ALJ") conducted a hearing

at which plaintiff appeared, represented by counsel, and testified. (R. 163-197). In

addition, Thomas Dunleavy appeared and testified as a vocational expert ("VE"). After

considering all the evidence of record, the ALJ found that plaintiff was not disabled

because she retained the ability to perform her past relevant work as an accounting clerk,

in a decision dated June 25, 1998. (R. 18-30). This became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review of the decision on January 4, 2002. (R. 7-8).

## A. Evidence of Record

Plaintiff was born on September 4, 1942, making her fifty-five years old at the time of the ALJ's decision in this case. (R. 34). She is 5'5" tall and weighs 198 pounds. (R. 81). She has a high school education. (R.56). For nearly 30 years, she worked as a payroll analyst for Amoco Corporation. (R. 56). The job required her to lift and carry heavy ledgers weighing up to thirty pounds, and involved frequent bending. (R. 57, 168). She stopped working due to constant musculoskeletal pain. (R. 169-170).

Plaintiff apparently began to experience musculoskeletal pain in mid-1994, and sought treatment in September of 1994. (R. 75). At that time, Dr. Thelma Evans noted tenderness in the sacroiliac area. (R.75). Straight leg raising was negative and there was no lumbar area tenderness. (R. 75). Dr. Evans diagnosed sacroiliac sprain, hypertension, and obesity. (R. 75). In December of 1994, plaintiff returned with complaints of lower back pain and a swollen right foot. (R. 74). X-rays revealed degenerative changes at L4, L5, and S1. (R. 73). Dr. Evans referred plaintiff to a physical therapist for a course of treatment. (R. 73). Despite this, and prescribed non-steroidal anti-inflammatory medication, plaintiff's pain continued. (R. 116, 121).

In March of 1995, plaintiff reported that physical therapy seemed to increase her back pain. (R. 116). She underwent pelvic traction at that time, with minimal relief. (R. 116). By April, plaintiff said she felt better after pelvic traction, but also that she had "good days and bad." (R. 112). She felt her pain ranged from five to seven on a ten-point scale. (R. 112). On April 25, examination revealed lumbosacral tenderness and spasm, although straight leg raising was negative. (R. 109). Dr. Joseph Thometz, who evaluated plaintiff's back pain on May 3, 1995, reported that reflexes were normal and motor was intact. (R. 110). Forward flexion was limited, and extension was limited to fifteen degrees. (R. 110). He diagnosed plaintiff with degenerative joint disease. (R. 110).

On May 9, 1995, plaintiff underwent a CT scan, which revealed mild degenerative facet changes from L3 through S1. (R. 79). Dr. Thometz then recommended a lumbar corset and referred plaintiff for a bone scan, as her pain was quite limiting. (R. 24). The bone scan, performed on May 27, revealed degenerative changes in the thoracic spine, lumbar spine, and both knees. (R. 78). There were possible, mild degenerative changes in the right hip, and abnormal uptake in the right maxillary sinus. (R. 78). After reviewing these results, Dr. Thometz recommended continued conservative measures, but left open the possibility of an injection should plaintiff's pain become sufficiently severe. (R. 101).

Dr. Edith Panopio examined plaintiff on May 26, 1995, at the request of the Social Security Administration. Peripheral pulses were equal bilaterally, and hand grip and

dexterity were normal. (R. 83). Plaintiff complained of tenderness in the lumbar area and exhibited paraspinal muscle spasm. (R.83). Plaintiff complained of pain that limited lumbar spine flexion to twenty degrees, and lumbar extension and rotation to ten degrees. (R.83). Muscle strength and tone were normal, and deep tendon reflexes were 2+ and equal bilaterally. (R. 83). There was no evidence of nerve root compression. (R. 83). Plaintiff's right foot was painful and swollen, but there was no limitation of motion. (R. 81, 84). X-rays revealed increased lumbar lordosis and slight arthritic sclerosis. (R. 85). Based on Dr. Panopio's examination, Dr. Ernst Bone, a state agency physician, completed a residual functional capacity assessment. He opined that plaintiff could lift or carry fifty pounds occasionally, and twenty-five pounds frequently; stand or walk for six hours of a work day; and sit for six hours of a work day. (R. 88).

Plaintiff continued to see her treating physician, Dr. Evans, fairly frequently for her complaints of back pain. Dr. Evans felt plaintiff suffered from severe degenerative joint disease, for which anti-inflammatory medication provided little relief. (R. 102). In June of 1995, plaintiff began to complain of pain and stiffness in her hands. (R. 102). By October 6, 1995, plaintiff had undergone two epidural injections, without significant relief, including a facet joint block performed on September 7, 1995. (R. 95, 98).

On September 2, 1997, plaintiff underwent another consultative examination, this time conducted by Dr. Leonard Smith. (R. 122-127). Plaintiff arrived with a cane, although it had not been prescribed by her physician. (R. 122). She complained of pain

4

and loss of strength in her arms, and constant back pain. (R. 122). She also claimed that her fingers "fell asleep." (R. 122). Dr. Smith noted plaintiff's right ankle was swollen, but that range of motion was not affected. (R. 123). There was increased dorsal rounding of the spine but, contrary to previous x-rays, normal lordotic curvature. (R. 123). Forward flexion was eighty degrees, while extension was thirty degrees. (R. 123). Straight leg raising was possible to 100 degrees, and gait was normal. (R. 123). Lower extremity deep tendon reflexes were equal and active, and sensation was normal. (R. 123). There was decreased sensation in plaintiff's fingers. (R. 123). Dr. Smith stated the diagnosis was mild degenerative changes of the lumbar spine with increased lordosis, but no radiculopathy. (R. 124). Plaintiff had undergone an EMG relative to possible carpal tunnel syndrome, but results were not available. (R. 124). Dr. Smith felt that plaintiff was limited in her ability to stand or walk to six to seven hours a day, and two to three hours at a time. (R. 126). There was also some limitation in plaintiff's ability to handle and feel. (R. 126). There were no restrictions on her ability to lift or carry.

On September 7, 1997, Dr. Evans certified plaintiff as disabled, with a severely limited ability to walk, for the purposes of a handicapped parking placard. (R. 138). In April of 1998, Dr. Evans noted that she was treating plaintiff for arthritis of the lumbosacral spine as well as bilateral carpal tunnel syndrome. (R. 143). Dr. Evans felt that, despite aggressive treatment by neurosurgeons, pain clinics, physical therapists, and orthopedists, plaintiff's symptoms continued to be severe. (R. 143). She opined that

plaintiff was unable to function due to back pain, and unable to use her hands due to carpal tunnel syndrome. (R. 143). Plaintiff saw Dr. Evans approximately once every three months since May of 1993. (R.144).

On April 21, 1998, Dr. Evans reported that plaintiff could sit for four hours and stand and walk for two hours each in a work day. (R. 149). She could frequently lift or carry up to five pounds, and occasionally lift or carry no more than 20 pounds. (R. 149-150). She could not use her hands for pushing and pulling arm controls or for fine manipulation. (R. 150). She could not use her feet for pushing or pulling leg controls. (R. 150). Dr. Evans felt plaintiff was unable to bend, squat, crawl, climb, or reach. (R. 150). According to Dr. Evans, her assessment was supported by tenderness and spasm of the lumbosacral spine, CT and MRI scans, x-rays, and an EMG/nerve conduction study of the upper extremities. (R. 145).

At her administrative hearing, plaintiff testified that she stopped working due to lower back pain, when "it just got so [she] couldn't function the way [she] should on the job." (R. 169). She rated her pain as a constant "nine on a ten-point ascending scale," and indicated that it radiated into her buttocks and right leg. (R. 169-170). Plaintiff estimated that she could sit for twenty-five to thirty minutes and stand for five to ten minutes, but claimed to do no walking. (R. 171). Most of the time, according to plaintiff, she watched television or read the Bible. (R. 179). She also complained of numbness and aching in her hands, especially her right hand. (R. 171). She testified that

she could lift a gallon of milk, but could write for only short periods. (R. 171, 173). She said she was unable to twist open a jar and felt she would be unable to type. (R. 173). She wears wrist splints to bed and for three hours during the day. (R. 172). She also uses a cane to help her get up from a chair or negotiate the stairs in her home. (R. 185). Plaintiff testified that her sister and her son did most of the chores around her home, but that she heated simple meals in the microwave, and drove to the grocery store, sometimes to the mall, and to church, although she was not always able to sit through an entire service. (R. 178-179). She takes Tylenol III, Ibuprofen, Motrin, Relafen, and Propoxyohene for her pain, Pramperem for blood pressure, and Tagamet for stomach pain. (R. 176-178). Relafen upsets her stomach; Motrin and Relafen make her drowsy. (R. 176, 185).

Thomas Dunleavy testified as a VE at the hearing. He noted that plaintiff's past relevant work was a combination of data entry and accounting clerk. (R. 190). He testified that plaintiff's job had been of medium exertional level but that, customarily, such jobs are sedentary. (R. 190). The ALJ asked him to assume an individual could lift fifty pounds occasionally and twenty-five pounds frequently, sit or stand for six hours each, and frequently perform bending, stooping, crawling, kneeling, crouching, or climbing stairs. (R. 191). The VE stated that such an individual would be able to perform plaintiff's past work as she performed it. (R. 191). The ALJ then adjusted the hypothetical, to account for a limitation on lifting to ten pounds and the requirement of

7

a sit/stand option, as well as a five to ten minute break every hour due to medication side effects. (R. 192) (R. 191). The VE felt plaintiff could perform her past work as it is customarily performed. (R. 192).

## B. ALJ's Decision

After considering all the evidence of record, the ALJ determined that the plaintiff suffered from back pain, but that her impairments did not meet or equal an impairment list as disabling by the Commissioner's regulations. (R. 29). The ALJ also found that, to the extent plaintiff complained of pain that precluded all work activity, her complaints were not fully credible. (R. 29). The ALJ determined that plaintiff retained the capacity to perform work that involved "occasional lifting and carrying of 50 pounds; frequent lifting and carrying of 25 pounds; sitting standing, and walking for up to six hours in any workday; with marked limitation on the climbing of ladders; and slight limitations on bending, stooping, kneeling, climbing stairs, or fine and gross manual manipulation. (R. 29). As the requirements of plaintiff's past work as an accounting clerk did not exceed these limitations, the ALJ determined that she could perform her past relevant work. (R. 29). As a result, the ALJ found plaintiff not disabled under the Act. (R. 32). This stands as the Commissioner's decision and is presently before this court for review. 42 U.S.C. § 405(g).

## II. <u>ANALYSIS</u>

The applicable standard of review of the Commissioner's decision is a familiar one. The Social Security Regulations provide a five-step inquiry to determine whether a plaintiff is disabled:

1) whether the plaintiff is currently employed;

2) whether the plaintiff has a severe impairment;

3) whether the plaintiff has an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) whether the plaintiff can perform his past relevant work; and

5) whether the plaintiff is capable of performing work in the national economy.

20 C.F.R. §§ 404.1520; 416.920; *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). The burden of proof is the plaintiff's through step four; if it is met, the burden shifts to the Commissioner at step five. *Id.* Here, the ALJ determined, at step four, that the plaintiff could perform her past relevant work as an accounting clerk.

The court must affirm this decision if it is supported by substantial evidence. 42 U.S.C. § 1382(c)(3). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997), *citing Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Binion*, 108 F.3d at 782. Where conflicting evidence would allow

reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Id.* Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Id.* Based on the record in this case, and after reviewing the ALJ's decision, we cannot find the denial of benefits to be supported by substantial evidence.

The parties' dispute in this matter focuses on the ALJ's assessment of plaintiff's credibility. This is understandable, as these cases essentially turn on whether the ALJ believes a plaintiff when they say they are unable to work. If there are cases where the plaintiff testifies that he or she feels great, or is simply too active to have time to read the Bible, we are unaware of them. So, in this case, the ALJ did not believe plaintiff when she claimed to be in constant pain that was a nine out of ten in intensity. In fact, he found that the now sixty-year-old woman with degenerative arthritis could perform medium work; work that required her to occasionally lift and carry fifty pounds and frequently lift and carry twenty-five pounds. 20 C.F.R. § 404.1567(c). The truth, we suspect, lies somewhere in between, as it most often does.

In evaluating the credibility of statements supporting a Social Security application, we have noted that an ALJ must articulate the reasons behind credibility evaluations. *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003)(citing Social Security ruling 96-7p). Those reasons must be grounded in the evidence and articulated in the determination

or decision. *Id.* The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. In this case, the ALJ's assessment fall short of these requirements in a few respects.

In assessing the plaintiff's credibility, the ALJ first noted that plaintiff "has been treated on an extremely conservative basis." (R. 26). According to the record, the plaintiff has undergone at least two and perhaps three epidural facet joint blocks, and pelvic traction. She takes a constellation of medication, and has undergone a course of physical therapy. She has seen her treating physician on a regular basis in the hopes of gaining some relief for a decade. While it is true that plaintiff does not appear to have been considered a candidate for surgery, "extremely conservative" might be a poor choice of words to describe her course of treatment. We are reluctant to require a plaintiff undergo back surgery before he or she can be found disabled.

The ALJ also found that plaintiff engaged "in a relatively rigorous range of daily, social, and household tasks." (R. 26). As the ALJ noted, "[s]he does some cooking, driving, attends church, and shops." (R. 26). Similar ranges of activities have been described as "fairly restrictive" by the courts, and not of a sort that necessarily undermines or contradicts a claim of disabling pain. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). Further, plaintiff testified that her sister or her son helped with nearly

11

all of the work around the house. To characterize such a lifestyle as "relatively rigorous" is simply not accurate.

Next, the ALJ addressed the reports of the plaintiff's treating physician, Dr. Evans. Here, the ALJ seemed to find fault with Dr. Evans' assessment that while plaintiff was disabled, she could nevertheless "engage in a relatively rigorous range of exertional activities involving the lifting of up to 20 pounds, sitting for four hours in any workday, and standing and walking for two hours in any workday." (R. 26). Significantly, however, Dr. Evans assessment, which included the restriction that plaintiff could lift no more than five pounds frequently, falls far short of a capacity for medium work and is instead closer to what the Commissioner's regulations would define as sedentary work. 20 C.F.R. § 404.1567(a). And again, given the doctor's complete report on plaintiff's capacities, "relatively rigorous" was an unfortunate choice of words. Finally, we note that in finding plaintiff disable for the purposes of a parking placard, Dr. Evans merely certified that plaintiff's ability to walk was severely limited due to arthritis. (R. 138). That is not necessarily inconsistent with her report on plaintiff's capacity for work.

The ALJ also questioned the consistency between plaintiff's complaints and the objective medical evidence. Specifically, the ALJ referred to the CT scan which revealed only mild degenerative changes, and a cardiac stress test that revealed good exercise tolerance. (R. 26). Certainly, the CT scan might call into question allegations of constant debilitating pain, but the cardiac stress test, performed for ten minutes in order to assess

12

a possible heart ailment (R. 114), provides little insight into plaintiff's back impairment. The ALJ also stated that Dr. Evans' opinion regarding plaintiff's condition was unsupported by any objective findings. On the contrary, Dr. Evans referred to the CT scans, x-rays, and presence of muscle spasm; all of which constitute objective medical findings. What concerns the court in this regard is the mention of a phantom EMG/NCV study by both the ALJ and Dr. Evans. Dr. Evans called it evidence of carpal tunnel syndrom, while the ALJ referred to it as "negative." As it is nowhere to found in the record, the court cannot determine which characterization is accurate.

In the end, we are not convinced by the ALJ's articulation of his reason for finding plaintiff not credible and, as would follow from that, not disabled. The Commissioner may not have been either, as she notes in her brief that "even if the Plaintiff were restricted to a limited range of sedentary work, the VE's uncontradicted testimony would support a finding that Plaintiff could return to her past relevant work as generally performed in the economy." (*Memorandum in Support of Defendant's Motion for Summary Judgment*, at 11). She returns to this notion near the conclusion of her brief as well. (*Id.*, at 15). Unfortunately for the Commissioner, we do not review her brief – or the VE's testimony, for that matter – to determine if it is supported by substantial evidence. *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003). We must confine ourselves to the conclusions of the ALJ, which as we have discussed, are not supported by substantial evidence.

## III. CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment is DENIED, and the plaintiff's motion for summary judgment or remand is GRANTED to the extent that this case is remanded to the Commissioner for further proceedings consistent with this opinion.

ENTERED: _Edward A. Bobrick_
EDWARD A. BOBRICK
U.S. MAGISTRATE JUDGE

**DATE:** August 19, 2003